**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-CR-0068-CVE |
| ) | |
| JACK WAYNE McKERRELL, JR., ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Now before the Court is defendant's motion to suppress (Dkt. # 16). In the indictment (Dkt. # 4), McKerrell is charged with being a felon[1] in possession of firearms[2] pursuant to 18 U.S.C. §§ 922(g)(1), 924(a)(2). McKerrell alleges that his Fourth Amendment rights were violated and moves the Court to suppress any physical evidence seized from him or his home on March 2, 2006 and any evidence obtained as a result of the illegally seized evidence. On May 26, 2006, the Court held a hearing on defendant's motion. Plaintiff called three witnesses: Sergeants Charles Witt and Steve Middleton of the Tulsa Police Department, and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Agent Josh Petree. Defendant testified and called his wife, Susan McKerrell ("Susan"), as a witness.

---

[1] McKerrell had been convicted of unauthorized use of a vehicle in 1991; possession of a firearm after former conviction of a felony in 1994; and unlawful possession of controlled drug in 1996.

[2] The four firearms possessed were one semi-automatic rifle, two .45 caliber semi-automatic pistols, and one 12 gauge pump-action shotgun.

**I.**

On February 24, 2006, law enforcement officers learned that there were outstanding arrest warrants for defendant. An anonymous crime stoppers' tip identified where defendant lived and described defendant as armed and dangerous. The tipster reported that defendant was a methamphetamine user and was armed with an assault rifle and a shotgun. Sergeant Witt investigated and found that defendant had two outstanding felony warrants from Tulsa County, Oklahoma, for "Possession of a Stolen Vehicle," two municipal traffic warrants from Tulsa, and a four-count felony warrant from Craig County, Oklahoma, for drug and traffic charges. Officers confirmed the location of defendant's residence[3] through information in the utility company records.

On March 2, 2006, Sergeant Witt received another tip reporting that defendant was at his home and working in the front yard. In response to the tip, eight officers surrounded defendant's home and announced their presence. At the time of their arrival, both the garage door and front door were open. Officers saw defendant, who had been sitting in his front room, get up and close the front door, proceed to the garage and close the garage door. Officers ordered defendant to raise his hands, but he declined to do so. Officers proceeded to make additional announcements.

Susan exited the home through the front door and told officers that her 5-year-old son was inside with defendant and gave officers the home telephone number. Following police instruction, Susan moved from the front of the home to the side yard. Sergeant Middleton called the house phone repeatedly and eventually spoke with defendant and instructed him to come outside with his hands empty and visible. Negotiations ensued during which defendant disputed the validity of the arrest warrants and stated that he wanted to call his lawyer. Sergeant Middleton hung up to allow

---

[3]   9719 E. 4th Street, Tulsa, Oklahoma.

defendant to phone his attorney. When Sergeant Middleton called back, defendant had not spoken with his attorney. Defendant asked that Susan be allowed to return to the house but his request was denied. The only limitation placed upon Susan's movement was the prohibition from returning to her home, where her husband was involved in a standoff with police. According to Susan, she asked officers if she could speak with her husband on the phone but her request was denied. Sergeant Middleton finally convinced defendant, after a third phone call, to surrender peaceably. Approximately twenty minutes elapsed from the time that officers arrived and the time that defendant surrendered.

Sergeant Middleton testified that he did not speak to defendant regarding a search of the home and did not ask defendant for consent to search the home. Sergeant Middleton did discuss the difference between an arrest warrant and a search warrant with defendant. According to defendant, he expressly refused consent to search his home.

After defendant surrendered, officers immediately arrested him and took him to a police station without asking him any questions. Defendant was taken into custody and transported to a police station for safety reasons. Susan testified that she asked to speak with him and police denied this request. Sergeant Witt testified that defendant was transported away immediately and that there was no conversation concerning if he could speak with Susan. Following the arrest, officers dispersed. Agent Petree and Sergeant Witt remained at the house and asked Susan whether they could speak with her. At this time, Susan was back in her home and reunited with her son. Additionally, no weapons were brandished, no threats were made, and Sergeant Witt had removed his riot gear and was plain-clothed. Susan allowed the officers inside her home to talk. According to the officers, the tone of the conversation was genial. Sergeant Witt testified that, during the

conversation, Susan's son brought toys to him and was playful. Susan testified that she could not remember whether her son engaged playfully with Sergeant Witt and stated that "the night was a blur." Officers asked Susan about her authority over the house and learned that she does the laundry and, thus, has access to every room and drawer of the residence.

Officers requested Susan's consent to search the residence and explained that she had the right to refuse consent, the right to follow them as they searched, and the right to stop the search at any time. According to Susan, Agent Petree promised that he would "take it easy" on defendant if she consented to the search. Agent Petree admitted that he told Susan that it would benefit her husband if the police searched the home and found no contraband. At the suppression hearing, Susan testified that she was aware that there were firearms in the house at the time she consented to the search. Officers gave Susan a consent form, which she admits she read and signed on March 2, 2006. The consent form states:

> I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below.
> I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceedings.
> I understand that I may consult with an attorney before or during the search.
> I understand that I may withdraw my consent to this search at any time prior to the search's termination.
> This consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever.
> I have read the above statement of rights, understand these rights, and hereby authorize agents of the [ATF] to conduct a complete search of the property described below.

Dkt. # 23, Ex. 2. At no time after consenting to the search, did Susan terminate her consent. All four firearms listed in the indictment were discovered and seized from the home at this time.

**II.**

Defendant argues that the Court should suppress the firearms because the police were unreasonable to rely on Susan's consent in the face of his present and express refusal to consent to a search of their home. Additionally, defendant argues that Susan's consent to search was not voluntary as it was given under duress in light of officers earlier actions when they prohibited her from returning to her home.[4]

In a recent opinion, the Supreme Court held that police without a search warrant may not search a home where both residents are present and one resident consents to the search while another resident expressly objects. Georgia v. Randolph, 126 S.Ct. 1515 (2006). Unlike Randolph, defendant was not present when police obtained consent from his wife to search the shared residence. Id. at 1519. By the time that Susan invited officers inside her home, defendant had already been transported to the police station for safety purposes. There is no evidence that police removed defendant "for the sake of avoiding a possible objection." Id. at 1527. Where "it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out,'" it is also fair to say that Agent Petree and Sergeant Witt had reason to be

---

[4] Defendant also argues that the arrest warrants did not give officers authority to enter his home. Defendant cites Steagald v. U.S., 451 U.S. 204 (1981), but that case fails to support counsel's interpretation that an arrest warrant restricts officers from entering the home of the person named in the arrest warrant. Id. at 214 n.7 ("'If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'") (quoting Payton v. New York, 445 U.S. 573, 602-603 (1980)). Regardless, defendant's arrest was completed before officers entered his home, making the arrest warrant irrelevant to the later search of the house.

confident that Susan's voluntary consent, in the absence of an objecting co-tenant, was sufficient to authorize their search of the shared premises. <u>Id.</u> at 1522-23.

In <u>U.S. v. Matlock</u>, 415 U.S. 164 (1974), the Supreme Court found that the police did not violate the Fourth Amendment when they searched a shared residence pursuant to the consent of one occupant while the recently arrested co-occupant sat nearby in a squad car. Similar to defendant, Matlock was arrested in his yard and was not asked whether he consented to a search of his shared home. <u>Id.</u> at 166. In allowing another individual to share possession of property, one assumes the risk that the other person "might permit the common area to be searched." <u>Id.</u> at 171; see <u>Fraizier v. Cupp</u>, 394 U.S. 731, 740 (1969) (holding that, by sharing his duffle bag with his cousin, suspect assumed the risk that his cousin "would allow someone else to look inside.").[5] "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared. <u>Matlock</u>, 415 U.S. at 170.

Any consent granted by a third party must be voluntary. <u>U.S. v. Gutierrez-Hermosillo</u>, 142 F.3d 1225, 1230 (10th Cir. 1998) (holding that defendant's minor child had legal capacity to grant third-party consent to enter defendant's motel room). Whether consent is given voluntarily is determined from the totality of the circumstances. To establish voluntariness of consent, "the government must proffer 'clear and positive testimony that consent was unequivocal and specific

---

[5] The consent of a third party to a search of common premises is effectual if the third party has either the actual authority or the apparent authority to consent to a search. Whether or not a third party has the actual authority to grant entry to law enforcement officers is determined by the test articulated in <u>Matlock</u>. The test is whether the third party has "mutual use of the property[,] ⋯ generally ha[s] joint access or control for most purposes [,] ⋯ and [whether] the others have assumed the risk that one of their number might permit the common area to be searched." <u>Matlock</u>, 415 U.S. at 171 n.7. Defendant does not dispute that Susan had actual authority to consent to the search.

6

and freely and intelligently given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion." U.S. v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996) (finding consent was voluntary). For example, in Gutierrez-Hermosillo, the Tenth Circuit upheld a district court's determination that the defendant's child voluntarily consented to a search of the motel room, despite her daughter's minority, the early hour of the confrontation, and the number of officers present. 142 F.3d at 1230. The government bears the burden of proving that "there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." U.S. v. Nicholson, 983 F.2d 983, 988 (10th Cir. 1993) (citing U.S. v. Price, 925 F.2d 1268, 1270 (10th Cir. 1991)).

### III.

"The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." United States v. Long, 176 F.3d 1304, 1307 (10th Cir.1999). In the instant case, the Court must decide whether the officers or defendant and Susan were more credible and, thus, which version of the facts is more credible.

On cross-examination, Susan admitted that she perjured herself under oath as affiant. After officers seized firearms from her home, Susan signed an affidavit that she had no knowledge of the items seized from the home. See Government Ex. 3. Later, Susan confessed before the grand jury and at the suppression hearing that she did know that the guns were at the house at the time of the search. As a known perjurer, Susan lacks credibility before the Court. In contrast, the officers have over forty years of collective law enforcement experience and provided the Court with consistent versions of the events on March 2, 2006. It is undisputed that Susan read and signed the consent form and that she knew that guns were in the home. Yet, defendant asks the Court to believe she

was coerced into signed the consent form because Agent Petree allegedly promised her that officers would "go easy" on her husband if she signed the form. Given Susan's knowledge that contraband would be found, defendant's conception of coercion is implausible. Susan's consent was "'unequivocal and specific and freely and intelligently given.'" McRae, 81 F.3d at 1537.

Defendant's evidence of coercion includes the number of officers, the presumption that guns were drawn at the time of the stand off, the fact that officers prohibited Susan from returning to the home during the standoff, the fact that her child was present, thereby giving her incentive to cooperate and not be arrested, and the allegation that Agent Petree promised that her consent would benefit her husband. However, at the time that Susan consented to the search of the home, she was not restrained in any way, no guns were drawn, and the officers did not intimidate. Despite not being allowed to return into her home earlier, at the time that she was back in her home the rules had clearly changed and a reasonable person would have believed that they were free to withhold consent and end the conversation with the officers. Susan's consent "was given without implied or express duress or coercion." Id. at 1537.

Defendant argues that his refusal to consent to a search of his home is evidenced by his closing of doors upon seeing police and his decision to end the standoff by leaving the home to surrender. However, the Court finds that these actions were taken to avoid arrest and to avoid the possibility of armed officers coming into his home to forcibly arrest him while his son was also inside the home. Any statement defendant made to Sergeant Middleton that he did not want police in his home is less credible than the officers' statements to the contrary. Based on the credibility of the witnesses, the Court finds that defendant was not "a present and objecting co-tenant" and that

he never articulated "express refusal of consent to a police search" to officers prior to Susan's consent to search their home. Randolph, 126 S.Ct. at 1523, 1528.

The Court finds persuasive the testimony of the officers that defendant did not expressly refuse consent to search his home. It is undisputed that defendant was absent when Susan consented to a search of the house. The evidence offered at the suppression hearing supports a finding that Susan voluntarily consented to a search of her home on March 2, 2006 without any implied or express duress or coercion.

### IV.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Dkt. # 16) is hereby **denied**.

**DATED** this 30th day of May, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT